UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WILLIAM MOTTEN,

               Petitioner,                Case No. 07-10426

vs.                                   Thomas L. Ludington
                                   United States District Judge

THOMAS K. BELL,

               Respondent.       Michael Hluchaniuk
                                   United States Magistrate Judge

_____/

## REPORT AND RECOMMENDATION
## ON PETITION FOR RELIEF UNDER 28 U.S.C. § 2254

## I.    PROCEDURAL HISTORY

Petitioner William Motten filed the present action, through counsel, on
January 26, 2007, pursuant to 28 U.S.C. § 2254. (Dkt. 1). An answer to the
petition was filed on August 3, 2007. (Dkt. 5). A reply to the answer was filed by
petitioner on September 17, 2007. (Dkt. 6). The case was referred to Magistrate
Judge Komives on December 4, 2007 for preliminary motions and other duties as
designated in 28 U.S.C. § 636(b)(1)(B). (Dkt. 8). This matter was reassigned to
the undersigned on January 14, 2008. (Dkt. 9). After consideration, it is
recommended that the petition for writ of habeas corpus be denied for the reasons
stated below.

## II.    FACTUAL BACKGROUND

In May of 2000, Lorenzy Henson, nicknamed China Man, operated an "after hours" establishment at 3337 Superior Street in the City of Detroit. (Dkt. 10-27, Att. 28, p. 196). This unlicensed business had been in operation for a number of years as of that point in time and offered food, drinks and gambling to its numerous customers. (Dkt. 10-27, Att. 28, pp. 197-198). The business was operated out of this residential location with the entertainment being provided on the main floor and a living area for Mr. Henson on the second floor. (Dkt. 10-28, Att. 27, p. 197).

The business area consisted primarily of three rooms with one room mainly used for food and drinks. That room contained a bar. A second room was used primarily for gambling which, for the most part, was a "craps"[1] game. A third room contained the kitchen and some slot machines. (Dkt. 10-28, Att. 27, pp. 162-164). Access to the house was through a locked door from the street that could be opened with a "buzzer." Once inside the main door, the customers were normally searched for weapons before being allowed to pass through a locked iron grate door. (Dkt. 10-30, Att. 29, pp. 124-25). Mr. Henson employed a number of

---

[1] Craps is a game involving two dice where the player rolls the dice and attempts to score certain point totals, normally 7 or 11.

people in the operation of this business. Business hours usually ran from 1:00 a.m. or 1:30 a.m. to at least 5:00 a.m. (Dkt. 10-28, Att. 27, pp. 200-01). On May 20, 2000, Edward Jarrett, nicknamed Shorty, was working outside the house watching the cars of customers who came to the business. (Dkt. 10-28, Att. 27, p. 202). Charles Mickle was the doorman for a portion of the evening, while Claude Smith and Howard Crooks operated the craps table. (Dkt. 10-28, Att. 27, p. 205). Yvonne Fields was the bar maid. (Dkt. 10-30, Att. 29, p. 34). Mr. Henson was present during business hours and supervised the activities taking place at the Superior Street location. A typical crowd at Henson's after-hours business was at least 50 people. (Dkt. 10-28, Att. 27, p. 200).

Among the customers who came to the business with some regularity was petitioner, William Motten, who was only known as "Tiger" to Henson and his employees in May of 2000. (Dkt. 10-28, Att. 27, p. 199). Petitioner was over six feet tall, weighed over two hundred pounds and had distinctive skin discolorations on his neck and hand. (Dkt. 10-28, Att. 27, p. 194). Petitioner had come to Mr. Henson's business in the early morning hours of May 20, 2000, with two other individuals. (Dkt. 10-28, Att. 27, p. 203). At some point after he arrived, petitioner began playing craps and a dispute arose over a $20 bet. (Dkt. 10-28, Att. 27, p. 208). Apparently, petitioner was not paid on the bet despite his belief

that he was entitled to the money. Later, when another craps player was paid on a disputed bet, petitioner became angry and again demanded to be paid the money to which he thought he was entitled. (Dkt. 10-32, Att. 31, pp. 39-43). To bolster his demand for the money, petitioner pulled out a handgun and a struggle ensued among petitioner, Smith, and Crooks near the craps table. (Dkt. 10-32, Att. 31, pp. 43-45). At the outset of the struggle, the handgun in petitioner's hand was pointed at the ceiling and several rounds were discharged. As one might expect, the initial fired shots at Henson's after-hours business resulted in pandemonium with employees and customers running in different directions. (Dkt. 10-32, Att. 31, pp. 43-45, Dkt. 10-30, Att. 29, p. 140).

When the first shots were fired, Mr. Mickle, the doorman, was at the front door of the house letting out his niece. (Dkt. 10-30, Att. 29, p. 124). He came back to the interior of the house to see what was going on and he observed petitioner in the "dice room" holding a gun. Prudently, Mr. Mickle decided to "get the hell out [of] the way," but only made it to the area of the bar before, unfortunately, feeling the "sting" of the first of four bullets. (Dkt. 10-30, Att. 29, pp. 127-28). Of the four bullets that hit him, three bullets were in the leg and one was in the "stomach." (Dkt. 10-30, Att. 29, p. 128). After being shot, Mr. Mickle "crawled" to the back of the house. (Dkt. 10-30, Att. 29, p. 129). At trial, Mr.

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

Mickle identified petitioner as the person who shot him. (Dkt. 10-30, Att. 29, p. 128). As of the time Mr. Mickle left the area of the front door following the shots, he did not see Mr. Jarrett and believed that he was still outside of the house. After the shooting, Mr. Mickle had surgery for his wounds and had his "bowels" "put" "back." (Dkt. 10-30, Att. 29, p. 131).

Mr. Henson had been sleeping with his head on the bar when the first shots were fired. (Dkt. 10-28, Att. 27, p. 206). Before falling asleep, Mr. Henson recalled getting involved in a dispute between petitioner and his employees at the craps table. (Dkt. 10-28, Att. 27, p. 208). After being awakened by the shots, Mr. Henson observed petitioner in some sort of struggle with Mr. Crooks and Mr. Smith, his two employees running the craps table. (Dkt. 10-28, Att. 27, pp. 206-07). Mr. Henson observed petitioner's hand holding a handgun that was pointed towards the ceiling. Mr. Henson observed the handgun to be a "bronze 45" that he had seen before when it was taken from petitioner on a previous occasion at the after-hours business. (Dkt. 10-28, Att. 27, p. 215). Mr. Howard and Mr. Smith broke off the struggle with petitioner and they ran from the room followed by petitioner. Petitioner re-entered the room and then Mr. Mickle entered the room and began to walk towards the kitchen. Mr. Henson observed petitioner shoot at Mr. Mickle "like target practicing" and saw Mr. Mickle fall down. (Dkt. 10-28,

Att. 27, p. 217).  Mr. Henson lost sight of petitioner briefly and then petitioner

returned to the room.  Petitioner looked at Mr. Henson in the eye, and shot him

once in the "stomach" from a distance of about six feet.  (Dkt. 10-28, Att. 27, pp.

219-20).  Mr. Henson had a series of thirteen surgeries following the shooting and

remained disabled as of the time of the trial in 2002.  (Dkt. 10-28, Att. 27, pp. 227-

28).  Robert Huber, one of the customers at Henson's that night, witnessed

petitioner shoot Mr. Henson and Mr. Mickle.  (Dkt. 10-32, Att. 31, p. 54).

Rachel Harris was employed by Henson to work at the after-hours business

but was not working on May 20, 2000.  (Dkt. 10-30, Att. 29, p. 34).  She

happened, however, to go to Henson's that day to visit with Yvonne Fields, who

was working on that date.  Ms. Harris was familiar with petitioner, having seen

him at Henson's a number of times while she was working.  (Dkt. 10-30, Att. 29,

p. 36).  On May 20, 2000, she heard petitioner's dispute regarding a gambling

issue and subsequently heard shots fired.  (Dkt. 10-30, Att. 29, p. 42).  When the

shots were initially fired, she fled outside the house and stood in the relative safety

of the side of the house waiting to see what was going to happen next.  (Dkt. 10-

30, Att. 29, pp. 41-42).  At some point, Ms. Harris heard more shots from inside

the house and some time later, she saw a number of people, including petitioner,

run from the house.  (Dkt. 10-30, Att. 29, pp. 43-47).  After most of the people left

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

the house, Ms. Harris re-entered the house. She saw Mr. Jarrett on the floor of the foyer, between the outside door and the metal grate door, and she saw Mr. Henson laying on the bar being tended to by some people. Mr. Mickle was in the back room by the kitchen and he appeared to be hurt. (Dkt. 10-30, Att. 29, pp. 50-52).

At some point during the evening, William Underwood arrived at Henson's after-hours business and went inside. He had just gotten off work and went to Henson's to get something to eat. Mr. Underwood spoke with Mr. Jarrett, a long-time acquaintance, outside the house when he first arrived and then entered the house. (Dkt. 10-31, Att. 30, p. 15). On learning that the food on the menu that night did not include what he wanted, Mr. Underwood began to leave the house. On his way out, he observed petitioner arguing with Mr. Howard and Mr. Claude at the dice table. (Dkt. 10-31, Att. 30, p. 17). He continued to leave the house and resumed talking to Mr. Jarrett outside the house and, while they were talking, they heard gunshots from inside the house. (Dkt. 10-31, Att. 30, p. 19). Mr. Underwood hurriedly went to his car to get away from the trouble that appeared to be taking place inside and, in the excitement of the moment, he did not see where Mr. Jarrett went. (Dkt. 10-31, Att. 30, pp. 21-22). Mr. Underwood had some difficulty getting his car started, so he was not immediately able to drive away from the scene. While he was in the process of attempting to start his car, he

observed a number of people, including petitioner, run from the house. (Dkt. 10-31, Att. 30, p. 24). Underwood drove to the 7th Precinct headquarters of the Detroit Police Department and reported the shooting at Superior Street to Officer Robert Lalone. (Dkt. 10-31, Att. 30, p. 25).

Officer Lalone, and his partner Jeremy Aguayno, arrived at 3337 Superior at approximately 4:05 a.m. (Dkt. 10-27, Att. 26, p. 146). As they entered the premises to investigate the shooting complaint, they found Mr. Jarrett unconscious in the foyer and apparently suffering from gunshot wounds. (Dkt. 10-27, Att. 26, pp. 147-148). They found Mr. Henson laying on the bar inside the house with two people providing aid to him. Mr. Henson was able to speak with the officers and he identified the person who shot him as "Tiger" and also gave a physical description of that person. (Dkt. 10-27, 10-28, Att. 26, 27, pp. 149-151). Mr. Mickle was not able to communicate with the officers due to the severity of his wounds. (Dkt. 10-28, Att. 27, pp. 152-153).

The house was processed as a crime scene and six shell casings were found in the house. (Dkt. 10-28, Att. 27, p. 175). One spent "45 auto" caliber bullet was found upstairs and three bullet holes were located in the ceiling near the craps table. (Dkt. 10-28, Att. 27, pp. 175, 185). A second spent "45 auto" caliber bullet was found on the main floor. (Dkt. 10-28, Att. 27, p. 173). All six shell casings

were "45 auto" caliber and all six shell casings, as well as the spent bullets, were fired from the same gun. (Dkt. 10-30, Att. 29, pp. 81-82). No guns were found in the residence and no witness testified at the trial that anyone except petitioner had a gun in his or her possession. Mr. Jarrett died of a single gunshot wound that entered his right leg and exited at his "lower left buttock." (Dkt. 10-31, Att. 30, p. 12). During the trial, no witness testified that they saw who shot Mr. Jarrett. "Tiger" was not identified as petitioner until more than a year after the incident. (Dkt. 10-31, Att. 30, p. 33).

## III.  STATE PROCEDURAL HISTORY

An arrest warrant for petitioner was issued on June 26, 2001. Following the preliminary examination, an information was filed charging petitioner with (1) first degree murder regarding Edward Jarrett, (2) assault with intent to murder regarding Lorenzy Henson, (3) assault with intent to murder regarding Charles Mickle, (4) felon in possession of a firearm, and (5) felony firearm. The first trial on these charges began on March 26, 2002 and ended on March 29, 2002, with the jury acquitting petitioner on the murder charge and being unable to reach a verdict on the remaining charges. The trial judge declared a mistrial following a deadlocked jury instruction, which produced the not-guilty verdict on the murder

charge but no verdicts on the remaining charges. (Dkt. 1, p. 11). No objections were made regarding the mistrial declaration by the judge.

A second trial, before the same judge, on the remaining charges, began on May 28, 2002, and concluded on May 31, 2002. The jury in the second trial sent notes to the trial judge indicating that it was deadlocked. A deadlocked jury instruction was given, which was followed by another note from the jury indicating their inability to reach a unanimous decision. After a replay of one of the witness's testimony, the jury remained deadlocked. At that point, the trial judge declared another mistrial and recused himself from the apparent third trial. (Dkt. 1, pp. 11-12). No objections were made to this mistrial declaration.

The third trial began on September 30, 2002 and ended on October 2, 2002, with petitioner being found guilty of all four of the charges he faced. Petitioner was sentenced on October 24, 2002. He faced a life sentence on each of the two assault with intent to murder charges, a five-year sentence for the felon in possession charge, and a mandatory two-year consecutive sentence on the felony firearm charge. The judge sentenced him to 285-700 months on each of the two assault charges, 3-5 years on the felon in possession charge, and a 2-year consecutive sentence on the felony firearm charge. (Dkt. 1, p. 1).

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

Petitioner filed a direct appeal with the Michigan Court of Appeals.  On appeal, he argued that (1) there was insufficient evidence to convict him of the assault with intent to murder charges, (2) his conviction violated his rights under the double jeopardy clause, (3) the evidence regarding Edward Jarrett's death should not have been admitted into the trial, and (4) his sentence, which included consideration of Mr. Jarrett's death as an aggravating factor, violated the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004).

The Court of Appeals affirmed the conviction by opinion dated July 20, 2004, but remanded the case to the trial court in order to consider the impact of *Blakely*, which had only recently been decided.  (Dkt. 6, Exhibit 1).  The appellate court found that there was sufficient evidence of the assault convictions, that the double jeopardy issue could only be reviewed for plain error due to the lack of an objection in the trial court, (and, on review, there was no plain error regarding the double jeopardy issue), and that the evidence relating to Mr. Jarrett's death was properly admitted (1) to show petitioner's intent in shooting Mr. Henson and Mr. Mickle and, (2) otherwise, it was evidence of the *res geste* of the crime and, therefore, proper evidence.  Petitioner sought to have his conviction reviewed by the Michigan Supreme Court, but was denied leave to appeal on November 2, 2005.

While the application for review of the issues regarding the conviction was pending before the Michigan Supreme Court, the case was remanded to the sentencing judge to reconsider the sentence in light of *Blakely*. On March 11, 2005, the sentencing judge re-imposed the original sentences, ruling that *Blakely* did not apply to any of the sentencing decisions that were applicable to petitioner's sentence. (Dkt. 10-41, Att. 40, p. 35). Petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals and later sought leave to appeal to the Michigan Supreme Court. His application for delayed appeal was denied by the Court of Appeals on November 17, 2005 and his application for leave to appeal to the Supreme Court was denied on June 26, 2006.

## IV.  FEDERAL REVIEW

Petitioner filed the present petition under 28 U.S.C. § 2254, which is part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), on January 26, 2007. (Dkt. 1). In his petition, three claims are raised: (1) petitioner's third trial violated his rights under the double jeopardy clause of the Constitution, (2) petitioner's due process rights were violated by being convicted on insufficient evidence with respect to the assault with intent to murder charges, and (3) petitioner's due process rights were violated by having his sentence enhanced

based on conduct for which he had been acquitted as provided for in *Blakely v. Washington, supra*.

A.    Standard of Review

Under the AEDPA, federal courts have limited authority to grant relief to a state prisoner. Where a state court has adjudicated the petitioner's claim on the merits, a federal court can only grant a writ of habeas corpus where the state's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The [federal] court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). The federal writ should not issue just because the "state-court decision applied clearly established

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Rather, "the state court's application of clearly established federal law [must have been] objectively unreasonable." *Cone*, 535 U.S. at 694.

Additionally, federal habeas review is barred where the state court finds that the petitioner defaulted the claim pursuant to an independent and adequate state procedural rule "unless the prisoner can demonstrate cause for the default of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

B.    Double Jeopardy Claim

Citing *Arizona v. Washington*, 434 U.S. 497 (1978), petitioner claims that the trial judge in his first two trials abused his discretion in declaring a mistrial, based on a deadlocked jury, and therefore his conviction in the third trial violated his double jeopardy rights under the Fifth Amendment. Petitioner acknowledges that no objection was made to either mistrial declaration in the trial court or before the third trial, but claims that any objection would have been futile. Petitioner further argues that a double jeopardy issue, under state law, can be raised for the first time on appeal and that no objection in the trial court was necessary.

Respondent contends that, based on the lack of an objection in the trial court, petitioner's claim is barred in this Court because there was an independent and adequate state procedural rule that was applied to deny relief in the state court. Respondent submits that, pursuant to state law applicable to petitioner's case, an objection was necessary to preserve an issue for appeal and that the authority relied on by petitioner regarding this point no longer applies. Respondent also contends that the lack of an objection constitutes "consent" to the mistrial decisions and, therefore, petitioner has, in essence, waived his right to now challenge the decision of the trial judge.

Federal habeas law clearly denies a petitioner the opportunity to have a claim considered in federal court where the petitioner has defaulted on that claim in state court and a state court procedural rule prevents the issue from being addressed on the merits in state appellate review. *Coleman v. Thompson, supra.* With respect to the double jeopardy issue, the State Court of Appeals essentially held that it was not considering the claim on the merits because the claim had not been "preserved." The State Court of Appeals did, however, go on to review the issue under the plain error standard and found that there was no plain error associated with the issue. Petitioner initially argues that the State Court of Appeals should have considered the double jeopardy claim on the merits because,

according to petitioner, double jeopardy claims can be made for the first time on appeal. Respondent points out, however, that, as of the date of petitioner's trial, Michigan law required that all claims, even constitutional ones, must be preserved by objection in the trial court to be properly considered on the merits in the state appellate courts. *People v. Carines*, 460 Mich. 750, 763, 597 N.W.2d 130 (1999). This procedural rule included double jeopardy claims. *People v. Kulpinski*, 243 Mich. App. 8, 11, 620 N.W.2d 537 (2000). Additionally, consideration of the claim under a plain error standard is the equivalent of imposing a procedural bar to consideration of the claim on the merits for the purpose of habeas review. *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). Petitioner has not claimed cause for the procedural default.

Petitioner also contends, without much analysis, that any objection in the trial court would have been futile. Even if true, it is not clear how this fact impacts a federal habeas review. Whether petitioner should be relieved of the obligation to make a contemporaneous objection based on the effort being futile seems a matter for the state courts to have decided. Federal courts do not conduct a direct review of the petitioner's conviction and, in this regard, should not be considering whether the procedural bar to consideration of the claim on the merits should be excused where the objection would have been futile. Petitioner cites no

authority for this proposition and did not raise a "futility" exception to the application of the procedural default rule in the state courts. Here, the state court declined to review this issue on the merits based on a procedural default and that serves as an adequate and independent state court ground, which places petitioner's claim outside the scope of issues subject to review in federal court.

    C.    <u>Sufficiency of the Evidence</u>

Petitioner claims that he was convicted of the assault with intent to murder charges without sufficient evidence to constitutionally support those convictions. Petitioner was convicted under Mich. Comp. Laws 750.83, which provides that "[a]ny person who shall assault another with intent to commit the crime of murder, shall be guilty of a felony, punishable by imprisonment in the state prison for life or any number of years." The elements of this offense are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder. *People v. Brown*, 267 Mich. App. 141, 147,703 N.W.2d 230 (2005).

Petitioner argues that the deficiency in the proofs relates to the evidence of an intent to kill. The State Court addressed this issue on the merits and concluded that sufficient evidence of an intent to kill was presented. The State Court applied state law, which provided that the evidence must be viewed in the light most favorable to the prosecution to determine if a rational trier of fact could have

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

found the elements of the offense beyond a reasonable doubt. In applying that standard, the State Court ruled that the reviewing court must draw all reasonable inferences and resolve credibility conflicts in support of the jury's verdict. The State Court pointed to certain facts in the record – including witness testimony that petitioner shot Mr. Mickle "like he was target practicing" and that he "looked [Lorenzy Henson] in the eyes" before he shot him – that would allow a reasonable juror to infer that petitioner intended to kill Mr. Mickle and Mr. Henson when he shot them. The State Court also noted that both Mr. Mickle and Mr. Henson were shot in a critical area, their abdomen, and that another after-hours club employee, Edward Jarrett, was shot (apparently by petitioner) and killed during this sequence of events. All of these facts were cited by the State Court as establishing sufficient evidence to support the petitioner's convictions for the offense of assault with intent to murder.

Under the AEDPA, a federal court must determine if the State Court ruling, on the merits of petitioner's claim, resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

evidence presented in the State Court proceeding. *Mueller v. Bell*, 2008 WL 482278 (6th Cir. 2008).

United States Supreme Court precedent establishes that, to satisfy the due process required to support a criminal conviction, evidence must be presented that could convince a rational trier of fact beyond a reasonable doubt of the existence of every element of the offense. *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979). In order to determine whether this constitutional standard has been achieved, a reviewing court must consider the evidence in the light most favorable to the prosecution and decide whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Id.* at 319.

While not referring directly to *Jackson v. Virginia*, the state court opinion articulated the *Jackson* standard for sufficiency of the evidence, referring to a Michigan Supreme Court case, *People v. Johnson*, 460 Mich. 720, 597 N.W.2d 73 (1999), that relied on *Jackson* in describing the applicable sufficiency of the evidence standard for Michigan courts.

Petitioner appears to be arguing that the state appellate court made an unreasonable determination of the facts in light of the evidence presented at the trial and, therefore, his constitutional rights have been violated. Petitioner refers to evidence at the trial suggesting that the shooting of Mr. Mickle and Mr.

Henson was accidental rather than intentional and, thus, evidence of intent to kill was insufficient.

Respondent has pointed out that this Court should not weigh the evidence in assessing its sufficiency and has cited evidence in the record from which a rational trier of fact could arguably have properly inferred, beyond a reasonable doubt, an intent to kill on the part of petitioner. Those facts include (1) the nature of the injuries sustained by the victims and, in the present case, the fact that both victims had serious injuries that resulted in surgeries, (2) the nature of the weapon the victims were assaulted with, in this case a deadly weapon (firearm), and (3) the evidence showed that the petitioner deliberately fired the gun at the victims.

A review of the entire trial record reveals evidence that is inconsistent with petitioner's arguments in the instant petition. Petitioner argues that the evidence indicates that all the shots fired by petitioner at Henson's after-hours club were accidental. While there may be some inconsistencies among the witnesses as to certain facts and there may be some facts that could give rise to more than one possible inference, the record as a whole indicates that the shots fired by petitioner were not accidental. "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

conflicts in favor of the prosecution, and must defer to that resolution." *Jackson v. Virginia*, 443 U.S. at 326.

A rational trier of fact could very well have concluded, beyond a reasonable doubt, that the petitioner became involved in an altercation with two after-hours club employees over a disputed $20 bet that petitioner had placed at the craps table. When he was not satisfied with the position the employees took regarding the bet, petitioner took out a 45-caliber semi automatic pistol, that he had brought to the club, and fired three shots into the ceiling in what could have been viewed as a warning to the employees. Petitioner briefly struggled with the two employees and then chased them from the room where the craps table was located. Petitioner then returned to the room and observed another club employee, Mr. Mickle, enter the room. According to Mr. Henson, petitioner shot Mr. Mickle like he was taking "target practice." Mr. Henson's description of petitioner's actions regarding Mr. Mickle in this fashion, and the fact that Mr. Mickle was shot four times and suffered serious injuries from his wounds, would certainly allow for an inference that petitioner deliberately and intentionally, rather than accidentally, shot Mr. Mickle. Petitioner contends that Mr. Mickle did not testify that petitioner targeted him and did not see anyone with a gun. While perhaps inconsistent to some degree, Mr. Mickle testified that he saw petitioner with a gun when Mr.

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

Mickle entered the room with the craps table and that petitioner was the only person with a gun. (10/1/02, p. 128). Mr. Mickle testified that he was shot trying to get away and the fact that he did not see petitioner "target" him is of little consequence in light of the fact that Mr. Mickle was shot four times. It seems highly unlikely that Mr. Mickle was shot four times "accidentally."

Mr. Henson testified that his shooting took place after the Mr. Mickle shooting. Mr. Henson, who is 74 years old, said petitioner left the room and then returned, looked him in the eye and shot him, from about six feet away. (9/30/02, pp. 219-20). Looking a person directly in the eye and then shooting him from close range, in a vital area of his body, with a relatively large caliber handgun also gives rise to an inference that petitioner intended to kill Mr. Henson.

Edward Jarrett's killing was not mentioned by respondent in the present case, but the trial court prosecutor argued that it was relevant to the petitioner's intent to murder and it was also one of the factors mentioned by the state court of appeals in concluding that there was sufficient evidence of intent to murder. Certainly the jury could have concluded that petitioner, the only person with a gun on the evening in question, could have shot and killed Mr. Jarrett and that such an

act could evidence an intent to kill Mr. Mickle and Mr. Henson.[2]  Additionally, the

fact that all three victims were employees of the after-hours club gives rise to an

inference that club employees were specifically targeted by petitioner.  This

inference is more easily reached, given the probable motive of the petitioner to

retaliate against the club for not paying him the money to which he thought he was

entitled.  The accidental shooting theory simply does not square with the fact that,

out of a crowd of 30-50 people, only club employees were shot.  The fact that

petitioner targeted club employees and one of them was shot to death strengthens

the inference that petitioner intended to kill Mr. Mickle and Mr. Henson when he

shot them.

Based on the above analysis, the state court's ruling that there was sufficient

evidence was not based on any unreasonable determination of the facts in light of

the evidence presented in the trial court.  As a result, petitioner has not

demonstrated that any rights he had under the constitution were violated within the

parameters of the AEDPA.

D.    Sentencing

---

[2] This conclusion could have been reached by the jury despite the petitioner's earlier acquittal of murdering Mr. Jarrett because the burden of proof for a conviction is much higher than for using the evidence as bearing on the intent to murder question.

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

The last claim raised by petitioner is that his sentencing violated his Sixth Amendment rights because it was based, in part, on facts that had not been found by a jury beyond a reasonable doubt.  Petitioner relies on *United States v. Blakely*, *supra*, to support his argument.

Respondent asserts that Michigan has an indeterminate sentencing system, rather than a determinate sentencing system, and therefore, the constitutional principles outlined in *Blakely* do not apply to the sentenced imposed on petitioner. Respondent relies on *People v. Claypool*, 470 Mich 715, 684 N.W.2d 278 (2004) to support its position.

Petitioner was originally sentenced on October 24, 2002 to 285-700 months on each of the assault with intent to murder charges.  The state court determined that the sentencing guideline range, which controls the low end of the indeterminate sentence, was 171-285 months based on a range that included a factor associated with the death of Mr. Jarrett.  Petitioner asserts that the guideline range would have been 126-210 months had the sentencing judge not included the "death" factor in the guideline calculation, as opposed to the "life threatening" injury factor which, petitioner contends, should have applied to the circumstances regarding Mr. Mickle and Mr. Henson.

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

In his direct appeal from his conviction, petitioner raised the issue of the constitutionality of a sentence, which included facts found by the judge rather than the jury. The Michigan Court of Appeals noted that the United States Supreme Court had only recently decided *Blakely* and, therefore, remanded the case back to the state trial court for reconsideration of the sentencing in light of *Blakely.*

On March 11, 2005, a hearing on that remand was held before the sentencing judge. Relying on *People v. Claypool, supra*, the sentencing judge determined that *Blakely* did not apply to the Michigan indeterminate sentencing procedure and declined to modify the sentence previously imposed. An order denying the motion for resentencing was entered on March 11, 2005.

Petitioner filed an application for delayed appeal and that application was denied by the state court of appeals on November 17, 2005, "for lack of merit in the grounds presented." An application for leave to appeal to the state supreme court was filed and that application was denied on June 26, 2006, because the court was "not persuaded that the question presented should be reviewed by this Court." With neither the state court of appeals nor the state supreme court

addressing the merits of petitioner's *Blakely* claim, the order of the sentencing

judge is the last state court order speaking to that issue.[3]

In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court

stated that "[o]ther than the fact of a prior conviction, any fact that increases the

penalty for a crime beyond the prescribed statutory maximum must be submitted to

a jury, and proved beyond a reasonable doubt." Four years later, the Supreme

Count decided *Blakely v. Washington*, 542 U.S. 296 (2004), clarifying a question

that lingered from the *Apprendi* decision. The question related to the exact

meaning of "statutory maximum" in that context. In *Blakely* the Court held that

"the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge

may impose *solely on the basis of the facts reflected in the jury verdict or admitted*

*by the defendant.*" *Id*. at 303-04. In *Blakely*, the defendant pleaded guilty to a

---

[3] The failure to file a timely appeal may, under certain circumstances, result in a determination that petitioner has procedurally defaulted on his claim and thereby lost the right to have the claim reviewed in federal count on habeas review. *Smith v. State of Ohio,* 463 F.3d 426 431-32 (6th Cir. 2006). However, respondent has not raised that issue and the merits of petitioner's claim will be considered. Further, because the decisions of the Michigan Court of Appeals and the Michigan Supreme Court denying the delayed appeal did not make it clear they were relying on a procedural default to turn down petitioner's request for relief, there may not be a clear and express statement as such by the state court and, without such a statement, the federal counts are bound to consider the issue on the merits. *Harris v. Reed*, 489 U.S. 255, 263 (1989).

charge of kidnaping of his wife and, based solely on the offense of conviction, he faced a sentence of up to 53 months. A sentencing hearing was conducted and the sentencing judge determined that the crime was committed with "deliberate cruelty" and, therefore, imposed a 90 month sentence. In vacating the sentence, the Supreme Court found that the sentencing judge was bound to sentence the defendant to no more than 53 months and if a greater sentence were to be imposed, based on facts associated with the manner in which the offense was committed, those facts had to be determined by a jury and proved beyond a reasonable doubt.

Petitioner argues that his situation is the same as in *Blakely* because the sentencing guideline calculation was increased based on the death of Mr. Jarrett, a crime of which petitioner had been acquitted. Respondent asserts that the Michigan sentencing scheme is based on an indeterminate sentence, which is different than the sentencing scheme in the State of Washington (at issue in *Blakely*), where the sentences are determinate.

In discussing the constitutional principles arising from the Sixth Amendment and applying them to the fact finding in the sentencing process, the *Blakely* majority clearly holds that a determinate sentencing procedure, rather than an indeterminate sentencing procedure, violated the constitution when judicial fact finding increases the sentence a defendant faces beyond the sentence he would

otherwise face.  *Id.* at 308-09.  The sentencing procedure in Michigan, being an indeterminate procedure, appears to be outside the type of situation that *Blakely* intended to correct.

While decisions of the state courts are not necessarily binding on federal courts, the Michigan Supreme Court examined its sentencing procedures after the *Blakely* decision was issued.  In *People v. Claypool, supra* the Court held that Michigan's indeterminate sentencing system was not impacted by the *Blakely* decision.  *Id.* at 286, n. 14.  More recently, the Michigan Supreme Court addressed the impact of *Blakely* on Michigan's sentencing system with greater precision.  In *People v. Drohan*, 475 Mich. 140, 715 N.W.2d 778 (Mich., 2006), the Court reviewed United States Supreme Court cases, including *Blakely*,  on Sixth Amendment implications for sentencing, as well as decisions from other states made in the wake of *Blakely*.  The Court affirmed the earlier conclusion that *Blakely* did not compel the conclusion that the Michigan sentencing system violated the Sixth Amendment because the Michigan system was an indeterminate sentencing system, unlike that at issue in *Blakely*.  Important to the Court's analysis was the determination that the Michigan system resulted in the minimum sentence being set by the sentencing judge, pursuant to a sentencing guideline calculation, and the maximum sentence was, in essence, set by the statutory

Report and Recommendation
Petition for Relief Under 28 U.S.C. § 2254
*Motten v. Bell*; 07-10425

maximum for the offense of conviction. Thus, in every Michigan conviction, the defendant faces the statutory "maximum" sentence for the offense of which he or she was convicted. *Id.* at 164-65. It is the statutory maximum sentence that must be established by facts found by the jury (or admitted by the defendant) according to *Blakely*, not the minimum sentence that may be imposed by the court in an indeterminate sentencing system.

The reasoning of the Michigan Supreme Court in *Drohan*, while not binding, is persuasive. The *Blakely* opinion limited itself to determinate sentencing systems and Michigan's system is indeterminate. Undoubtedly, the petitioner's sentence here was based on the fact that the sentencing judge, not a jury, determined that petitioner was responsible for the killing of Mr. Jarrett. This judicially-found fact increased the minimum sentence that petitioner was given, but did not necessarily result in a higher maximum sentence, given that the statutory maximum for the offense petitioner was convicted of was life imprisonment.

Based on the foregoing, the Michigan court did not make a decision regarding petitioner's sentencing that was contrary to, or that was an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court.

## V.    RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that the Court

**DENY** the petition for relief under 28 U.S.C. § 2254.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 10 days of service,

as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2).  Failure to file

specific objections constitutes a waiver of any further right of appeal.  *Thomas v.*

*Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d

505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others

with specificity will not preserve all the objections a party might have to this

Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931

F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829

F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any

objections must be served on this Magistrate Judge.

Within 10 days of service of any objecting party's timely filed objections,

the opposing party may file a response.  The response shall not exceed 20 pages in

length unless such page limit is extended by the Court.  The response shall address

specifically, and in the same order raised, each issue contained within the

objections by motion and order.  If the Court determines any objections are

without merit, it may rule without awaiting the response to the objections.

Date: September 25, 2008                          s/Michael Hluchaniuk
                                                  Michael Hluchaniuk
                                                  United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on September 25, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send electronic notification to the following: Brad H. Beaver and Marla R. McCowan, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: not applicable.

                                                  s/Tammy Hallwood
                                                  Deputy Clerk
                                                  U.S. District Court
                                                  600 Church Street
                                                  Flint, MI 48502
                                                  (810) 341-7850
                                                  tammy_hallwood@mied.uscourts.gov