UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM MOTTEN,

        Petitioner,

                                            Case Number 07-10426
v.                                             Honorable Thomas L. Ludington

THOMAS K. BELL,

        Respondent.

_____ /

**ORDER ADOPTING REPORT AND RECOMMENDATION,
OVERRULING PETITIONER'S OBJECTIONS, DENYING PETITION FOR
WRIT OF HABEAS CORPUS, AND GRANTING IN PART AND DENYING
IN PART A CERTIFICATE OF APPEALABILITY AND PERMISSION
TO PROCEED IN FORMA PAUPERIS ON APPEAL**

On January 26, 2007, Petitioner William Motten filed a petition for writ of habeas corpus

challenging the constitutionality of his conviction for two counts of assault with the intent to murder,

felon in possession of a firearm, and felony firearm. The charges stem from a shooting at an "after

hours" gambling and drinking establishment on May 20, 2000. A disputed bet on a craps game led

to an altercation, which ended with three men shot, one fatally.

On June 26, 2001, police issued an arrest warrant for Petitioner's arrest. Along with the four

crimes mentioned above, Petitioner was also charged with first degree murder. After a March 2002

trial, a jury acquitted Petitioner of the first degree murder charge, but could not reach a verdict on

the remaining charges. The trial judge declared a mistrial as to the four counts that the jury was

unable to reach a verdict. Counsel did not object to the declaration of a mistrial.

On May 28, 2002, a second trial commenced before the same trial judge on the remaining

charges. The trial court again concluded that the jury was deadlocked, and declared another mistrial.

Again, neither party objected to the declaration of mistrial. The trial judge, however, recused

himself from the third trial.

On September 30, 2002, a third trial commenced with the jury finding Petitioner guilty of two counts of assault with the intent to murder, felon in possession of a firearm, and felony firearm. Each assault with the intent to murder charge carried a maximum sentence of life imprisonment, the felon in possession of a firearm charge a maximum of five years imprisonment, and the felony firearm charge carried a mandatory consecutive sentence of two years. On October 24, 2002, Petitioner was sentenced to a term of imprisonment of 285 to 700 months for each of the assault charges, three to five years of imprisonment for the felon in possession charge, and a mandatory two-year term of imprisonment for the felony firearm charge.

Petitioner appealed his conviction and sentence to the Michigan Court of Appeals, arguing that (1) the prosecution did not meet its evidentiary burden to convict him of the assault with intent to murder charges, (2) his conviction violated his rights under the Double Jeopardy Clause of the Fifth Amendment, (3) the trial judge erroneously permitted evidence regarding the death of one victim, and (4) the trial judge erroneously considered the killing of one victim as an aggravating factor at sentencing, in violation of the United States Supreme Court's decision in *Blakely v. Washington*, 542 U.S. 296 (2004).

On July 20, 2004, the Michigan Court of Appeals affirmed Petitioner's conviction, concluding that the assault charges were supported by sufficient evidence, the decision to declare a mistrial following the second trial was not plain error, and the trial court properly admitted evidence of the death of one of the alleged victims. Notwithstanding those conclusions, the appellate court remanded the case to the trial court to reconsider the sentence in light of *Blakely*. After reconsideration, the trial court imposed the same sentences, concluding that *Blakely* did not

apply.

Petitioner sought a writ of habeas corpus from this court on January 26, 2007. His petition advances three challenges to his conviction and sentence. First, he contends that the third trial violated his right not to "be twice put in jeopardy of life or limb" for the same offense. U.S. Const. Amend. V. Second, Petitioner contends his rights under the due process clause were violated because the prosecution did not present sufficient evidence to support the assault with intent to commit murder convictions. Finally, Petitioner asserts that the trial judge violated Petitioner's due process rights when it considered evidence that one of the alleged victims died as a result of the shooting, even though he had been acquitted of murder.

On August 3, 2007, Respondent answered the petition. Respondent argues that Petitioner's double jeopardy claim was procedurally defaulted when he did not object at the trial court level to the declaration of a mistrial. Second, Respondent contends the state court adjudication of Petitioner's sufficiency of the evidence claim did not result in an unreasonable application of clearly established Supreme Court precedent. Finally, Respondent asserts that Petitioner's sentence did not violate *Blakely* because Michigan employs an indeterminate sentencing framework—distinguishable from the circumstance in *Blakely*.

On referral from this Court, Magistrate Judge Michael J. Hluchaniuk issued a report and recommendation that the Court deny the petition, largely adopting Respondent's arguments. Petitioner timely objected to the report and recommendation. While partly for an alternative reason, the Court will **ADOPT** the report and recommendation and **DENY** the petition for a writ of habeas corpus. The Court will, however, issue a certificate of appealability as to the double jeopardy claim and permit Petitioner to proceed in forma pauperis on appeal of that claim.

# I

As introduced above, Petitioner was suspected of shooting three men after an altercation at an "after hours" gambling establishment. According to witnesses, Petitioner became upset over a disputed twenty dollar bet on the dice game "craps." Shortly thereafter, gunfire broke out and three men working at the club were shot – Lorenzy Henson, Charles Mickle, and Edward Jarrett. Jarrett died as a result of his wounds, but Henson and Mickle each survived. The prosecution theorized that Petitioner, incensed by the dispute, gunned down the three men because they were employees of the after hours club.

On March 26, 2002, Petitioner was tried on five felony counts. After the conclusion of proofs, argument, and instructions, the jury began deliberation at 10:57 a.m. on March 28, 2002. *See* Tr. Mar. 28, 2002 at 83–84. At 1:36 p.m., the testimony of Henson, Mickle, and a customer, Robert Huber, were replayed at the jury's request. *Id.* at 83–149. At 2:36 p.m., the jury reinitiated deliberations, however, with a substitute juror. *Id.* at 149.

At 3:55 p.m., the court reconvened in the presence of the jury to address the following note from the jury: "Do we have to be unanimous on all five counts?" *Id.* The court provided the following instruction to the jury: "I explained that you must be unanimous, but you don't have to be consistent. You can find him not guilty of all counts, you can find him guilty of all counts, or guilty of some and not guilty of others. But it has to be unanimous." *Id.* at 149–50. The foreperson indicated that the jury had not reached a unanimous verdict on any count. *Id.* In light of the late hour of the day, the court dismissed the jury and instructed the jury to return the following morning to continue deliberations. *Id.*

At the conclusion of that day, defense counsel made the following criticism of the court's

direction to the jury: "You can't tell them, well, I'm sorry, the Court can tell them anything the Court wants. But I don't think it's appropriate to tell them they have to stay in until they reach a verdict, because – " *Id.* at 1511. Apparently, counsel and the jury expressed some concern because March 29, 2002 was Good Friday. In response, the Court summoned the jury and provided the following clarification regarding the time for deliberation:

> [T]he Court will be open tomorrow. In fact, everybody who works for the Court has to stay here until 12 or 12:30. . . .
>
> [The jury will continue deliberating] [u]nless you have finished your business before that [time]. But I'm not saying that you have to do something by a certain time. I want that to be understood. . . .
>
> But if you haven't [reached a verdict], you know, we'll just come back until we've, you know. I'm not trying to say that we're going to keep you in there on bread and water or anything lake that. But we'll be open until 12:30.
>
> But I'm not limiting you to that, either. I don't want you to think that you have to do it by a certain time; I'm just telling you what time the court closes.

*Id.* at 152–53.

After excusing the jury, the following exchange took place:

> The Court: Okay. The note that you want me to put on the record said, "We know that we will not be unanimous on any given count."
>
> So, what they're asking us is if we can discharge them. And I've stated to them they have to keep deliberating.
>
> Ms. Reed: Your honor, I believe there is a deadlock jury instruction. And if that's the note they sent out, then I would request that they get the deadlock jury instruction.
>
> The Court: I hate to do that, because, it looks –
>
> Ms. Reed: I didn't make a request –
>
> The Court: – coercive, you know. They're going to do what they want to do.

And by saying something like that only creates an appellate issue, that I'm trying to say. (a), the minority should listen to the majority, or whatever that is. I don't like to do that. They already know what the evidence is, you know.

But anyway, we'll let them go back in first thing tomorrow.

*Id.* at 153–54.

Although the Rule 5 materials do not include a transcript of the proceedings conducted on May 29, 2002, the parties agree that certain events occurred. First, the Court did provide a "deadlocked jury instruction." *See* Pet. at 11. Michigan Courts often employ a standard instruction when encouraging juries to continue deliberations. It provides:

(1) You have returned from deliberations, indicating that you believe you cannot reach a verdict. I am going to ask you to please return to the jury room and resume your deliberations in the hope that after further discussion you will be able to reach a verdict. As you deliberate, please keep in mind the guidelines I gave you earlier.

(2) Remember, it is your duty to consult with your fellow jurors and try to reach agreement, if you can do so without violating your own judgment. To return a verdict, you must all agree, and the verdict must represent the judgment of each of you.

(3) As you deliberate, you should carefully and seriously consider the views of your fellow jurors. Talk things over in a spirit of fairness and frankness.

(4) Naturally, there will be differences of opinion. You should each not only express your opinion but also give the facts and the reasons on which you base it. By reasoning the matter out, jurors can often reach agreement.

(5) When you continue your deliberations, do not hesitate to rethink your own views and change your opinion if you decide it was wrong.

(6) However, none of you should give up your honest beliefs about the weight or effect of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement.

Mich. Crim. Jury Instruction 3.12. After two hours of deliberation, the jurors reached a unanimous not-guilty verdict with respect to the first degree murder charge, but were unable to agree on the

remaining counts. The Court declared a mistrial with respect to the four remaining counts. There is no indication that counsel for Petitioner objected to that decision.

On May 28, 2002, the Petitioner stood trial for the four remaining counts. At 11:40 a.m. on May 30, 2002, the Court concluded instructions and the jury began deliberations. Tr. May 30, 2002, at 126. At 2:12 p.m., the jury, by note, asked to review certain testimony and the Court obliged the request. *Id.* At 2:41 p.m., the jury continued deliberation. *Id.* at 155.

At 3:00 p.m., the Court and the jury reconvened to address an apparent jury question regarding the elements of assault with the intent to commit murder. *Id.* at 155–56. The trial judge answered concisely, stating in part "[i]f he fired a gun at that man, and he intended to kill him when he shot that gun, find him guilty. If he didn't shoot it and he didn't intend to kill him, then find him not guilty. I can't really give you any instructions other than that." *Id.* at 156. The jury resumed deliberations at 3:01 p.m., and proceedings reconvened at 3:59 p.m. The Court offered the following communication to the jury:

> Okay. Ladies and gentlemen, I know that you've been working hard. However, in times [sic] of deliberation, there really hasn't been a lot.
>
> And you know, it's quite expensive and time consuming to try cases.
>
> So, I think that under the circumstances, when you listen to each other and you deliberate a little bit more on this case, maybe you will come to a consensus, and maybe you won't. But I'm asking you to try again.
>
> So we'll stop. Come back tomorrow morning at 9:00.

*Id.* at 156–57.

On the following day, May 31, 2002, the Court reconvened at 9:11 a.m. Tr. May 31, 2002 at 3. In an attempt to "assist [the jury] further," the court offered further thoughts with respect to the jurors' interaction while deliberating and factors relevant to evaluating Petitioner's intent. *Id.*

at 3–4.  He stated in part:

> Now, the main thing is that when I was explaining to you about specific intent, there are two ways that you can decide what it is.
>
> One is when a person comes out and says, "I'm going to kill you."  You know.  He said it.
>
> But suppose they don't say it.  Then you go in there and you consider the intent, consider all of the evidence.  All of it.
>
> You consider not only the number of shots that were fired, you consider the number of people who were shot.  If you find – I'm not telling you who did any shooting, that's up to you.
>
> But if you find that this defendant shot someone, consider that there were three people shot, one died.  You consider that.  You have to find that yourself, but you have to consider it all.  Not just the two, consider the whole res gestae.
>
> And even though you don't bring back a finding on the person that was deceased, because that's been disposed of, you may consider that to help you to decide what the intent was as to the other two people.

*Id.*  At 9:13 a.m., the jury resumed deliberations, and counsel for the Petitioner objected to the trial

judge's instructions after the jury left the courtroom.  *Id.* at 4.

> The Court:  Okay, go ahead, Ms. Reed.
>
> Ms. Reed:  Your Honor, I would object to the part of your instructions that refers to that they could consider the fact that one of the people shot was killed, even though that was disposed of.
>
> Because I think that leaves open to them to assume that Mr. Motten killed that man when as we all know, he's already been found not guilty of that crime.
>
> The Court:  Yeah, but that's what the jury found, Mr. Motten did kill the man. I mean, I make no secret about that.
>
> But the fact is I said they would have to find that he did.  And if they found that he did, they can consider that.  The[y] could consider as far as deciding what his intent was as to the other two.
>
> I didn't tell them that he shot the other person.  I said, "If you find that he did,

you consider the death of that third person the same as you would of the other two.["]

Ms. Reed: Well, I understand, but I thought the Court had already told them that they couldn't consider that because that had already been disposed of.

The Court: No, no, no. They can. I told them again – I understand it's kind of confusing.

But what I tried to explain to them, they don't have to consider his guilt or innocence as to that other person, but they can consider the fact that someone – because they can't.

They can't make any finding, but it's part of the res gestae that three people were shot and one was killed.

They can't say, "Okay, Mr. Motten is guilty of murder." They can say, "Well, Mr. Motten shot three people and one died, even though we can't make a decision on that third person. If he intended to kill the third person we can consider that in making a decision."

*Id.* at 4–7.

At 11:16 a.m., the court reconvened after receiving a note from the jury. *Id.* at 7. In response, the court and members of the jury had the following interaction:

The Court: All right. I accepted your note. Does this mean that you have not been able to reach a verdict in this case?

Juror No. 2: Correct.

The Court: And you don't think you can?

Juror No. 2: No, I don't think so.

The Court: All right. Well, I'm not going to force you, if you feel that you've come to that conclusion that you can't.

Pardon?

Juror No. 6: It was four of them.

The Court: Don't tell me what – I'm not interested in that. Because it looks as though the Court is coming down you [sic] the minority. You can't do that. I just

want to make sure that – would further deliberation in this case help you to make a decision in this case?  I want to be sure about that.

Because you have more time; you can have more time.

*Id.* at 7–8.  In response to a request from a juror to review additional testimony, the court replayed the testimony of Milke and the jury returned to deliberate at 11:39 a.m.  *Id.* at 9–23.  Nine minutes later, at 11:48 a.m., the jury again sent a note to the court.  *Id.* at 23.  The court responded to the note as follows:

Okay, I received your note.  Now, the only thing that the Court can ever do is instruct you on the law, and let you decide the facts.

And we've gone over the law three or four times.  You've heard the facts two or three times.  So, you've heard from all the people who were there.

The only thing that you had to do was decide if this gentlemen did the shooting, and what his intent was.

Well, you know, you're supposed to use your common sense.  I can't tell you, and go into details and say do this or do that.

But if you have one person that's dead, another man that's shot four times, and another man that's almost dead and his doctor came down here and told you he didn't even expect him to make it to his next birthday, well what do you think the man was trying to do?

The only person that ever shot at somebody to wound them was the Lone Ranger.

Now, if we can't make a decision as simple as that, then I don't really see any point in continuing with this matter.

So, I'm going to dismiss the jury.  We'll have to put Mr. Henson and the other man through this all over again, for no reason, whatsoever.  But this doesn't make any sense at all.

I don't know who's holding the jury up, I'm not ever going to ask.  But I'm telling you that you will never, ever hear a case where the facts are as simple as they are in this case.  It doesn't even make any sense.

-10-

This poor man has to walk bent over on a cane, he can't even stand up. He's shot in the stomach. And we can't reach a decision on what the intent was.

If anybody ever fires a gun at you, and I hope it never happens, the person's trying to kill you. That's all he's trying to do. It's just that simple.

But thank you for your services. You may be dismissed. Thank you.

*Id.* at 23-25. After the court dismissed the jury, Petitioner's counsel requested permission to speak with the jury. *Id.* at 25. The judge also disqualified himself from presiding over the matter further. Petitioner was subsequently found guilty of the four remaining counts in a third trial.

## II

Petitioner is entitled to the writ of habeas corpus only if the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. Mere error by the state court will not justify issuance of the writ; rather, "[t]he state court's application [of federal law] 'must have been objectively unreasonable.' " *Wiggins*, 539 U.S. at 521 (quoting *Williams v. Taylor*, 529 U.S. 362,

409 (2000)).

Additionally, this Court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also Austin v. Jackson*, 213 F.3d 298, 300 (6th Cir. 2000) ("All factual findings by the state court are accepted by this Court unless they are clearly erroneous.") (citing *Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995)).

### III

Petitioner asserts that the third trial violated the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution, which prohibits "the State from making repeated attempts to convict an individual for an alleged offense . . . ." *Lett v. Renico* (*Lett I*), 507 F. Supp. 2d 777, 783 (E.D. Mich. 2007) (citing *United States v. Dinitz*, 424 U.S. 600, 606 (1976); *Arizona v. Washington*, 434 U.S. 497, 503-04 (1978)), *aff'd*, 316 F. App'x 421 (6th Cir. 2009), *cert. granted*, 130 S. Ct. 1166 (2009). "Once jeopardy attaches, prosecution of a defendant before a jury other than the original jury, excluding any contemporaneously empaneled and sworn alternates, is barred unless (1) there is a 'manifest necessity' for a mistrial or (2) the defendant either requests or consents to a mistrial." *United States v. Gantley*, 172 F.3d 422, 429 (6th Cir. 1999) (quoting *Watkins v. Kassulke*, 90 F.3d 138, 141 (6th Cir.1996)).

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Renico v. Lett* (*Lett II*), 316 F. App'x at 424 (quoting *Green v. United States*, 355 U.S. 184, 187–88

(1957)).

A

The parties agree and the record is clear that Petitioner did not explicitly consent to either mistrial. Notwithstanding that fact, the Magistrate Judge concluded that Petitioner procedurally defaulted his double jeopardy claim because his counsel did not object to either declaration of mistrial. R&R at 14–17 (citing *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *People v. Kulpinski*, 243 Mich. App. 8, 11 (2000)). Consequently, the Magistrate Judge reasoned that an independent and adequate state procedural rule bars review of the merits of Petitioner's claim. *Id.*; *see also People v. Carines*, 460 Mich. 750, 763 (1999).

Under *Carines* and *Kulpinski*, if a criminal defendant does not object to the declaration of a mistrial by a trial court judge, Michigan appellate courts will review the trial judge's decision only for plain error. *Kulpinski*, at 11–12. If a state appellate court applies a plain error standard of review because the criminal defendant did not raise the issue in the trial court, federal courts are generally barred from reaching the merits of the claim on habeas review. *See Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). A petitioner can overcome the procedural bar on habeas review by showing cause for noncompliance with the state procedural rule and actual prejudice arising from the alleged misapplication of the constitutional rule at issue. *Id.* at 244–45; *Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000); *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999).

Here, the Court is persuaded that it should review the merits of Petitioner's double jeopardy claim, even though it would generally be procedurally defaulted, by the reasoning in a similar case. *See Lett I*, 507 F. Supp. 2d at 783. In *Lett*, the petitioner successfully argued that a state court's declaration of mistrial violated his double jeopardy rights even though the petitioner did not object

-13-

at the trial court.  *Id.*  The court focused on the fact that the record did not support a finding that the petitioner *consented* to the mistrial, and that the opportunity and potential for success of an objection at the trial court level were limited.  *Id.*; *see also Gantley*, 172 F.3d at 429.

Likewise, in the instant case, the record does not support the conclusion that Petitioner explicitly consented to either mistrial.  Nor did circumstances exist in the instant matter that demonstrated implicit consent.  *See Gantley*, 172 F.3d at 428-29.  "[A] defendant's failure to object to a mistrial implies consent thereto only if the sum of the surrounding circumstances positively indicates this silence was tantamount to consent."  *Id.* at 429.  For example, in the instant case, the record does not demonstrate that the court addressed the possibility of mistrials with counsel or that defense counsel had viable opportunities to lodge objections.  *See id.*  Indeed, the trial judge's prejudicial statements immediately proceeding the declaration of a mistrial likely made any objection futile.  In sum, there is little evidence that "positively indicate[s] [Petitioner's] willingness to acquiesce in the mistrial order."  *Id.* (quoting *Glover v. McMackin*, 950 F.2d 1236, 1240 (6th Cir. 1991)).

Moreover, even though Petitioner's double jeopardy claim was an "unpreserved issue," the Michigan Court of Appeals did substantively review Petitioner's claim under the plain error standard.  *See People v. Motten*, No. 246417, 2004 WL 1620813, at *2–3 (Mich. Ct. App. July 20, 2004) (per curiam).  The Court is persuaded by Petitioner's objection to the report and recommendation to substantively review his "unpreserved" claim to determine whether "manifest necessity" existed for granting the mistrial."  *Lett I*, 507 F. Supp. 2d at 783.  The specific question is whether the Michigan Court of Appeal's conclusion that the declaration of a mistrial was "manifestly necessary" is contrary to, or an unreasonable application of, clearly established Supreme

Court precedent.

## B

Petitioner argues that the facts in *Lett* are analogous to his circumstance. In *Lett*, the petitioner was tried for first degree murder and possession of a firearm during the commission of a felony. *Lett II*, 316 F. App'x at 422 (6th Cir. 2009). After completion of the first trial, which consisted of approximately ten hours of testimony from seventeen witnesses, the jury began to deliberate at 3:24 p.m. *Id.* At 4:00 p.m., the trial court excused the jury for the day. *Id.* The following morning, the jury resumed deliberations. *Id.* Throughout the course of the morning, the jury sent several notes concerning "routine requests for evidence, instructions, and breaks." *Id.* (citation omitted). Another note stated that "the jurors had 'a concern about [their] voice levels disturbing other proceedings . . . .' " *Id.* At 12:45 p.m., the jury sent the following note: "What if we can't agree? Mistrial? Retrial? What?" *Id.* In response, the trial court convened the jury in the presence of counsel and asked the foreperson, "I need to ask you if the jury is deadlocked; in other words, is there a disagreement as to the verdict?" *Id.* The foreperson answered affirmatively. *Id.* Then, the trial court inquired, "Do you believe that it is hopelessly deadlocked?" *Id.* The foreperson responded, "The majority of us don't believe that --" at which point the trial court interrupted the foreperson. *Id.* The trial court then directly inquired, "Are you going to reach a unanimous verdict or not?" and the foreperson answered "No, Judge." *Id.* The trial court immediately stated, "All right. I hereby declare a mistrial. The jury is dismissed." *Id.* at 423.

Subsequent to his conviction at a second trial, the petitioner challenged the declaration of mistrial. *Id.* The Michigan Court of Appeals agreed that the trial court's declaration of mistrial was without manifest necessity or the petitioner's consent. *Id.* The Michigan Supreme Court, however,

disagreed, finding "sufficient justification for the trial judge's conclusion that there was manifest necessity for a mistrial." *Id.*

A trial court's determination that a jury is deadlocked is accorded "great deference," but such a decision must be the exercise of "sound discretion." *Id.* at 424 (citing *Arizona v. Washington*, 434 U.S. 497, 506 (1978)). "Sound discretion means acting deliberately, responsibly, and carefully, not precipitately, hastily, and improvidently." *Id.* (citing *Washington* at 514 n.34 & 515–16) (quotations and brackets omitted). " 'Necessity' is not interpreted literally in this context; rather, 'there are degrees of necessity and [a reviewing court] requires a "high degree" before concluding that a mistrial is appropriate.' " *Id.* Manifest necessity is not limited to a circumstance where the trial court had "no alternative but to declare a mistrial." *Lett I*, 507 F. Supp. 2d at 784 (citing *Harpster v. Ohio*, 128 F.3d 322, 328 (6th Cir. 1997)).

When evaluating whether the trial court exercised sound discretion in declaring a mistrial, the Sixth Circuit reviews the following factors: "whether the judge (1) heard the opinions of the parties' counsel about the propriety of the mistrial; (2) considered the alternatives to a mistrial; and (3) acted deliberately, instead of abruptly." *Lett II*, 316 F. App'x at 426 (citing *Fulton v. Moore*, 520 F.3d 522, 529 (6th Cir. 2008) (citing *Washington*, 434 U.S. 497)). In *Lett*, the Sixth Circuit concluded all three *Washington* factors "weigh[ed] heavily against a finding of sound discretion." *Id.* at 428. Before declaring a mistrial, the trial court had not heard the opinion of counsel or considered any potential alternatives, such as providing a deadlocked jury instruction or providing more time for deliberation. *Id.* at 428. In addition, the trial court declared a mistrial in an "inexplicably abrupt fashion." *Id.* at 428.

## C

In the instant case, the Michigan Court of Appeals analysis was not contrary to or an objectively unreasonable application of clearly established federal law. Viewing the *Washington* factors in totality, the trial court exercised sound discretion.

With respect to the first trial, it is clear that counsel was not presented with an explicit opportunity to address the propriety of a mistrial on the record. While an opportunity for counsel to express their views is preferable, it is "not always required." *Id.* at 425 (citing *Washington*, 434 U.S. at 515–16). Petitioner's counsel did, however, express her concern that the trial court indicated that the jury would continue deliberating until it reached a verdict. This suggests Petitioner was mindful of the "significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all jurors." *Lett I*, 507 F. Supp. 2d at 784 (quoting *Washington*, 434 U.S. at 509–10). In response, the trial court clarified its instruction and directed the jury to return the following day to continue deliberations.

The second factor, consideration of alternatives, weighs in favor of sound discretion. After deliberating for approximately an hour and a half, the jury inquired into the unanimity requirement. After the trial court explained their duty to reach a unanimous verdict with respect to each count, the foreperson indicated the jury had not reached a unanimous verdict with respect to any count. Soon thereafter, the jury sent a note stating that "We know that we will not be unanimous on any given count." In response, the trial court directed the jury to return the following day to continue deliberations. Petitioner's counsel requested that the Court provide the jury a deadlocked instruction. While initially hesitant, the parties agree that the trial court did give a deadlocked instruction when the jury returned in the morning.

The next day, after two hours of deliberation, the jury returned a verdict with respect to the murder charge, but had not reached a verdict on any of the remaining counts. At that point, the trial court declared a mistrial as to the remaining charges. Without the benefit of a transcript, this Court is uncertain as to the relevant events. Notwithstanding that deficiency, it cannot be said that the trial court acted precipitately. The jury first indicated that it was deadlocked the previous day, and the Court excused the jurors for the day and gave a deadlocked instruction at Petitioner's request.

Viewed under the standard articulated in 28 U.S.C. § 2254(d)(1), it was not objectively unreasonable for the reviewing state courts to conclude that manifest necessity compelled the declaration of the mistrial. This conclusion is supported by the fact that the trial court considered and implemented multiple alternatives before declaring a mistrial, the jury indicated its belief that it would not reach a verdict with respect to all counts, and Petitioner's counsel expressed a concern that forced deliberation may lead to a coerced verdict.

**D**

Turning to the second trial, the trial judge's decision to declare a second mistrial was not contrary to or and unreasonable application of clearly established federal law. Once deliberations commenced, the jury met for approximately four hours, requesting to review certain testimony and further instruction with respect to intent. At the conclusion of that day, it appears that another deadlock was possible as the trial court stated "under the circumstances, when you listen to each other and you deliberate a little bit more on this case, maybe you will come to a consensus, and maybe you won't. But I'm asking you to try again." As in the previous trial, the trial court indicated that the jury would continue deliberations and return the following day.

On the following day, the court attempted to "assist [the jury] further," offering instructions

with respect to the legal issue that was preventing them from reaching consensus—whether the Petitioner maintained the necessary intent. From 9:13 a.m. to 11:16 a.m., the jury resumed deliberations. The jury then sent a note that lead the trial court to inquire "Does this mean that you have not been able to reach a verdict in this case?" A juror indicated that he or she did not believe the jury would reach a unanimous verdict. In response, the trial court indicated that it would not "force" the jury to reach a verdict, but stated, "I just want to make sure that – would further deliberation in this case help you to make a decision in this case? I want to be sure about that. Because you have more time; you can have more time." Next, a juror requested to review additional testimony and the trial court obliged the request. After resuming deliberations at 11:39 a.m., the jury sent another note at 11:48 a.m. Although the note is not part of the record in this case, the Michigan Court of Appeals stated that it indicated "that the jury was deadlocked and that it would not be able to reach a unanimous verdict." *Motten*, No. 246417, 2004 WL 1620813, at *3. Moreover, the trial court made its frustration clear; the judge emphasized the fact that he had repeatedly instructed the jury on the law and the jury had reviewed relevant testimony several times. The trial court expressed its belief that relevant issue, intent, was straightforward, and his confusion over the jury's inability to see the facts as he did.

The record demonstrates that trial court considered and implemented alternatives when the possibility of deadlock arose. At the first indication of disagreement, the trial court excused the jury for the day and directed the jurors to return the following day. The second time, in response to an express statement that the jury would not reach a unanimous verdict, the trial court made clear that the jury had more time and inquired as to whether additional deliberation would be helpful. This lead to a request to review more testimony. Once the jury resumed deliberations, however, the jury

sent another note less than ten minutes later. Regardless of its substance, the trial court interpreted the note to indicate that the jury could not reach a verdict. While his comments in response to the note are strong, the trial court's multiple attempts to guide the jury to continued deliberations does not demonstrate an abrupt or manifestly unreasonable decision.

Ultimately, the trial judge's reasoning underlying the decision to declare a mistrial could have been more clearly articulated, and it would have been helpful for reviewing courts if he had solicited argument on the question from counsel for Petitioner and for the State. The decision was not, however, contrary to or an unreasonable application of clearly established federal law.

## IV

Petitioner next objects to the Magistrate Judge's recommendation with regards to his sufficiency of the evidence claim. Specifically, Petitioner objects that there was insufficient evidence of intent to kill to sustain a conviction for assault with intent to commit murder under Michigan law. Because there is substantial evidence that Petitioner intended to kill Henson and Mickle, the objection will be overruled.

Under Michigan law, it is a felony to "assault another with intent to commit the crime of murder." Mich. Comp. Laws § 750.83. The elements of the offense are "(1) an assault, (2) made with an actual intent to kill, (3) which, if successful, would make the killing murder." *Johnigan v. Elo*, 207 F. Supp. 2d 599, 608 (E.D. Mich. 2002) (citing *People v. McRunels*, 237 Mich. App. 168, 181 (1999)). Petitioner contends there was insufficient evidence of an actual intent to kill to sustain the conviction under the Due Process Clause. *See In re Winship*, 397 U.S. 358 (1970). The appropriate question under *Winship* is whether, viewing the evidence in the light most favorable to the government, "any rational trier of fact could have found the elements of the offense beyond a

reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As the both the Michigan Court of Appeals and the Magistrate Judge have already emphasized, there is substantial evidence in this case that Petitioner intended to kill Mickle, who was shot four times while retreating from the scene, and Henson, who was shot once in the stomach. First, Henson's testimony indicated Petitioner shot at Mickle like he was "target practicing," and that Petitioner looked Henson "in the eye" before shooting him in the stomach. Second, both men were shot in vital areas, the abdomen. Third, both men, as well as the deceased man, Jarrett, were employees of the club and there was evidence that Petitioner was upset with the club over the disputed bet.

Moreover, the number of shots and the manner of the shooting indicate intent to kill. Mickle was shot four times and Henson, though only shot once, was fired on from close range. Both victims were shot with a .45 caliber handgun, which the Magistrate Judge noted fires a "relatively large" diameter bullet. In sum, viewing the evidence in the light most favorable to the government, there is ample evidence on which a reasonable jury could conclude that Petitioner intended to kill Mickle and Henson.

## V

Petitioner's final objection asserts that the Magistrate Judge misapplied U.S. Supreme Court precedent in determining that Petitioner's sentence does not violate the Sixth Amendment. *See Blakely v. Washington*, 542 U.S. 296 (2004). Petitioner contends that the sentence imposed, 285 to 700 months, violates *Blakely* because the minimum sentence increased based on the judge-found fact that Petitioner murdered Jarrett, even though he was acquitted of Jarrett's murder during the first trial. Petitioner's objection misstates the rule from *Blakely* and will be overruled. *See Montes v.*

*Trombley*, __ F.3d __, No. 08-2521, 2010 WL 935369, at *5–6 (6th Cir. Mar. 17, 2010).

In *Blakely* the U.S. Supreme Court held that the maximum sentence authorized by statute cannot be increased based on facts found by a judge rather than a jury. 542 U.S. 296. The maximum sentence authorized by statute is "the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Id.* at 304; *see also Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000).

Here, the jury verdict does not reflect that Petitioner murdered Jarrett, indeed, he was specifically acquitted of such conduct. However, with an indeterminate sentencing system like the one employed in Michigan, the trial judge was empowered to sentence Petitioner to the statutory maximum, life in prison, based solely on the fact of the conviction. Consequently, the judge's decision to increase the minimum sentence from approximately 170 months to 285 months based on his determination that Petitioner killed Jarrett does not even implicate *Blakely* because the maximum authorized sentence was life in prison. In an indeterminate sentencing system, a trial judge is free to rely on facts not found by a jury when determining the minimum sentence as long as the maximum sentence authorized by statute is not increased. *See Shaya v. Holder*, 586 F.3d 401, 406–07 (6th Cir. 2009) (noting that the maximum sentence is nondiscretionary pursuant to Michigan's indeterminate sentencing system); *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007).

## VI

In order to appeal this decision, Petitioner would need to obtain a certificate of appealability from this Court. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional

right." 28 U .S.C. § 2253(c)(2).  When a court rejects a habeas claim on the merits, the substantial

showing threshold is met if the petitioner demonstrates that reasonable jurists would find the district

court's assessment of the constitutional claim debatable or wrong.  *See Slack v. McDaniel*, 529 U.S.

473, 484–85 (2000).  "A petitioner satisfies this standard by demonstrating that jurists of reason

could disagree with the district court's resolution of his constitutional claims or that jurists could

conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El

v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying that standard, a district court may not conduct

a full merits review, but must limit its examination to a threshold inquiry into the underlying merit

of the petitioner's claims.  *Id.* at 336–37.

Petitioner is entitled to a certificate of appealability as to the double jeopardy issue because

the question is close, particularly in light of the still-pending appeal in *Lett*, and of significant

importance to Petitioner's rights under federal law.  130 S. Ct. 743.  Petitioner will also be granted

leave to appeal the double jeopardy question in forma pauperis because an appeal would not be

frivolous.  *See* Fed. R. App. P. 24(a).  A certificate of appealability and leave to appeal in forma

pauperis will be denied as to the remaining claims.

## VII

Accordingly, it is **ORDERED** that the report and recommendation [Dkt. # 11] is

**ADOPTED**.   Petitioner's objections to the report and recommendation [Dkt. # 12] are

**OVERRULED**.

It is further **ORDERED** that the petition for writ of habeas corpus [Dkt. # 1] is **DENIED

WITH PREJUDICE**.

It is further **ORDERED** that a certificate of appealability is **GRANTED** as to Petitioner's double jeopardy claim, but **DENIED** as to the remaining claims.

If is further **ORDERED** that permission to proceed in forma pauperis on appeal is **GRANTED** as to the double jeopardy claim, but **DENIED** as to the remaining claims.

s/Thomas L. Ludington
THOMAS L. fLUDINGTON
United States District Judge

Dated: March 18, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 18, 2010.

s/Tracy A. Jacobs
TRACY A. JACOBS